## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for New Century Bank, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | JURY DEMANDED |
| FAYE T. PANTAZELOS, JOHN R. BRINKMAN, GEORGE METZGER, ROBERT C. GREMLEY, RICHARD J. WHOLEY, and THOMAS J. ROMANO, | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for New Century Bank ("FDIC"), for its Complaint against Defendants Faye T. Pantazelos, John R. Brinkman, George Metzger, Robert C. Gremley, Richard J. Wholey, and Thomas J. Romano (collectively, the "Defendants"), states as follows:

## INTRODUCTION

1.      The FDIC brings this action in its capacity as Receiver for New Century Bank ("NCB" or the "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821. The FDIC seeks to recover more than $33 million in losses suffered because the Defendants – six of the Bank's former directors and/or officers – acted negligently and grossly negligently and breached their fiduciary duties by disregarding the Bank's loan policy, prudent lending practices, and regulatory warnings in connection with numerous commercial real estate ("CRE") and other loans during the period April 2005 to July 2008 (collectively, the "Target Loans").

1

2.      The acts and omissions that give rise to the Defendants' liability include, but are not limited to: (i) failing to establish adequate debt repayment programs; (ii) extending credit in excess of permitted loan-to-value ("LTV") ratio limits; (iii) failing to adhere to required debt-to-income ratios; (iv) permitting debt service coverage ratios below minimum requirements; (v) relying on outdated, unverified, and inadequate financial information for borrowers and guarantors; and (vi) extending credit outside the Bank's normal trade area.

3.      In this lawsuit, the FDIC seeks to collect damages flowing from the Defendants' negligence, gross negligence, and breaches of fiduciary duty, including, but not limited to, the Bank's lost operating capital.

## PARTIES

### Plaintiff

4.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, *et seq.* The FDIC was appointed as Receiver for NCB by the Illinois Department of Financial and Professional Regulation – Division of Banking ("IDFPR") on April 23, 2010, the same day the Bank was closed. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC succeeded to all rights, titles, powers, and privileges of NCB and NCB's shareholders, accountholders, and depositors, including, but not limited to, NCB's claims against the Bank's former directors and officers as set forth herein.

### Defendants

5.      Faye T. Pantazelos was the founder, President, Chief Executive Officer, and a Director of NCB from 1999 until the Bank closed. She was a member of the Officers Loan Committee ("OLC") and the Directors Loan Committee ("DLC") during her entire tenure at the Bank. She resides in Chicago, Illinois.

6.     John R. Brinkman was a Senior Vice President ("SVP") of CRE at the Bank, as well as a member of the OLC and DLC, from 2004 to 2008.  He resides in Homewood, Illinois.

7.     George Metzger was Executive Vice President of Commercial Lending at NCB from 2005 to 2009 and a Director of NCB from 2007 until the Bank closed.  He served as a member of the OLC from October 2007 through at least July 2008 and the DLC from October 2007 until the Bank closed.  He resides in Northbrook, Illinois.

8.     Robert C. Gremley was a Director of NCB from 1999 to 2008 and served as a member of the DLC from 2005 through at least July 2008.  He resides in Lincolnshire, Illinois.

9.     Richard J. Wholey was a Director of NCB from 2001 until the Bank closed and served on the DLC from 2005 through at least July 2008.  He resides in Crest Hill, Illinois.

10.     Pantazelos, Brinkman, Metzger, Gremley, and Wholey are collectively referred to as the "D&O Defendants."

11.     Thomas J. Romano was SVP of Commercial Lending at NCB from 2005 to 2010. He resides in Park City, Utah.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

13.     The Court has personal jurisdiction over the Defendants pursuant to 735 ILCS § 5/2-209, *et seq.* because, among other things, the FDIC's claims arise from the Defendants transacting business, committing tortious acts, and breaching fiduciary duties in Illinois.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the FDIC's claims occurred in this judicial district.

## FACTUAL BACKGROUND

**Bank History**

15.     In 1999, Pantazelos founded NCB to serve primarily as a CRE lender.  NCB was a wholly owned subsidiary of a single-bank holding company, NCB Holdings, Inc. ("NCB Holdings").  Pantazelos was the second largest shareholder of NCB Holdings, with a 5.8% share, as of March 5, 2010.

16.     The Bank's main office and two of its branches were located in Chicago.  A third branch was located in the Chicago suburb of Lincolnwood, Illinois.  The Bank had no offices outside of the metropolitan Chicago area, which was the Bank's target geographic market.  Several of the lending acts at issue herein occurred outside of the metropolitan Chicago area in speculative markets, such as Las Vegas, Nevada, where the Bank had no presence and the Defendants had no expertise.

**NCB Loan Policy**

17.     At all relevant times, the Bank maintained an extensive written loan policy that included, among other things, the following lending requirements and/or restrictions: (i) the source and terms of repayment must be clearly defined and supported within the loan presentation; (ii) the metropolitan Chicago area was the Bank's target geographic market; (iii) great due diligence and caution should be exercised when considering an unsecured credit because of the great risk to the Bank due to absence of collateral; (iv) in cases of refinancing to repay existing debt, the Bank should always question why the existing lender is not providing refinancing; (v) financing vacant land was undesirable; (vi) a debt-to-income ratio of less than 40 percent was generally required; (vii) the LTV ratio maximums were 65 percent for raw land loans, 75 percent for land development loans, 80 percent for non-residential loans, and 85

percent for construction loans; (viii) the minimum debt service coverage ratio was 1.15 for CRE

loans; and (ix) for a vacant land loan, the Bank should immediately, as part of a condition of

approval, implement a principal reduction program.

18.     The Bank's loan policy also stressed that the provisions relating to CRE lending

were intended to protect the Bank in the event of a national economic downturn.  The

introduction to the section on CRE lending stated:

> Commercial real estate financing is considered a cyclical market very much
> dependent upon the nation's economy on the whole, particularly interest rates,
> inflation and employment indices . . . .  Over the past twenty-five years, the
> Chicago commercial real estate market has experienced both boom and bust
> cycles severely impacting differing sectors each time.  **Therefore, commercial
> real estate loan officers must exercise astute, and careful due diligence on
> each of these market elements to minimize the prospects of an unanticipated
> adverse economic or market condition occurring which could significantly
> and negatively impact the Bank's position.**  (Emphasis in original.)

Despite acknowledging the risks associated with CRE lending, the Defendants permitted the

Bank to assume excessive concentrations in its loan portfolio.  In 2005, CRE loans amounted to

more than 600 percent of the Bank's Tier 1 capital and, in 2006, increased to nearly 800 percent.

19.     NCB's loan policy further required that a Loan Approval Memorandum

("LAM"), including the following information, be presented to the members of the OLC and/or

DLC for review prior to loan approval: (i) borrower description (*i.e.,* name, address, ownership,

length of Bank relationship, and credit source); (ii) loan request and relationship summary (*i.e.,*

loan type, amount, interest rate, term, monthly payment, fees, guarantors, purpose, and

repayment sources); and (iii) credit rationale, risk acceptance criteria, and loan policy exceptions

(*i.e.,* key credit issues and mitigating factors, conditions of approval, conditions to funding,

servicing requirements, relationship summary, project summary, and financial analysis of

borrowers and guarantors).  The LAMs were typically distributed prior to the OLC and DLC

meetings, where the loans were presented and then, or shortly thereafter, approved.

20.     The Defendants repeatedly ignored the Bank's loan policy requirements throughout the time period at issue.  The Defendants also repeatedly failed to undertake the analysis necessary to evaluate loans and approved loans without sufficiently informing themselves of information necessary to evaluate them fully.

## **TARGET LOANS**

21.     Between April 2005 and July 2008, the Defendants originated, recommended, approved, and/or administered numerous loans in violation of the Bank's loan policy and sound and prudent banking practices.  As detailed below, each Target Loan exhibited one or more of the following violations of the Bank's loan policy: (i) failing to establish adequate debt repayment programs; (ii) extending credit in excess of permitted LTV ratio limits; (iii) failing to adhere to required debt-to-income ratios; (iv) permitting debt service coverage ratios below minimum requirements; (v) relying on outdated, unverified, and inadequate financial information for borrowers and guarantors; and (vi) extending credit outside the Bank's normal trade area.

22.     The D&O Defendants each voted to approve four or more of the Target Loans described below.  In addition, Romano originated, recommended, and/or administered the Pine Ridge Club, Harp Des Plaines, GCC Merrillville Venture, and Eagle American/18 Leasing Target Loans.

### **AG Marketplace**

23.     On April 29, 2005, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $2.472 million loan to AG Marketplace LLC and Bobbe Marketplace LLC (collectively, "AG Marketplace") for the acquisition of office space and twelve parking spaces in

downtown Las Vegas, Nevada. The loan was guaranteed by "Guarantor A" and "Guarantor B."[1]

24.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the AG Marketplace loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.     Repayment was speculative because it depended on the borrowers selling the property within a year to a developer, under a one-year option agreement with the borrowers. Yet, nothing required the developer to purchase the property, and the borrowers lacked any defined alternative source of repayment if the developer declined to exercise its option.

b.     The LAM failed to include a cash flow analysis for the borrowers.

c.     The guarantors' debt-to-income ratios substantially exceeded the Bank's maximum of 40%.

d.     Brinkman, Gremley, Pantazelos, and Wholey approved the loan in excess of the 65% LTV ratio for vacant land, which was how the Bank and the appraiser characterized the property securing the loan.

e.     The annual net income expected from the property ($60,000) was insufficient to pay the interest-only payments on the loan. Thus, the loan included an interest reserve of $113,000 to bridge the difference. The interest reserve served no legitimate purpose, but served only to reduce the borrowers' interest-only payments.

f.     This Las Vegas, Nevada, loan was outside the Bank's target geographic region of the metropolitan Chicago area.

25.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, one of the alleged justifications for the collateral's location outside of the Bank's target geographic region was that Las Vegas allegedly was a regular vacation and business destination

---

[1] Guarantors A-W referenced herein represent individual guarantors whose names have been withheld to protect their privacy. The names of these guarantors will be provided once an appropriate protective order is in place.

for various members of the Bank staff.  That limited contact did not provide an adequate source of critical market information for financing real estate projects in an area where Brinkman, Gremley, Panatzelos and Wholey had no expertise and the Bank had no presence.

26.     By approving the AG Marketplace loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

27.     The borrowers defaulted on the AG Marketplace loan.

28.     As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the AG Marketplace loan, the FDIC incurred damages in excess of $1.6 million.

**Canzoneri Enterprises**

29.     On July 25, 2005, the DLC (Brinkman, Pantazelos, and Wholey) approved a $1.05 million loan to Canzoneri Enterprises, Inc. to purchase a 4.83 acre parcel of undeveloped land in unincorporated New Lenox, Illinois.  Then, on January 4, 2006, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved an additional $2.749 million loan to the borrower to purchase an additional 3.5 contiguous acres, as well as fund an interest reserve to clear the land and begin the annexation and entitlement process.  The borrower intended to have the entire property annexed by New Lenox and develop it as a retail site.  The loans were guaranteed by "Guarantor C."

30.     Brinkman, Gremley, Pantazelos, and Wholey received and signed LAMs, which revealed that the Canzoneri Enterprises loans violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

    a.    The borrower intended to repay principal for the loans first from a to-be-obtained construction loan and secondarily from the liquidation of the subject properties

securing the loans. Both of those sources of repayment were speculative because they were contingent upon: (i) the viability of commercial development for the subject properties, and (ii) the borrower raising sufficient equity to support a construction loan.

b.      The borrower had limited liquid assets and net worth, and the LAMs specifically concluded that the borrower's balance sheet was illiquid.

c.      The guarantor lacked an ability to repay the loans. If all of the guarantor's loans were included in the calculation, her debt-to-income ratio would reach 55%, exceeding the Bank's 40% limit.

d.      In making a vacant land loan, the Bank's loan policy required careful analysis of the borrower's and guarantor's cash flows to determine whether they could service the loan amount and related expenses without requiring liquidation of the collateral, and further required analysis of whether the property was properly zoned to accommodate the planned improvements. Yet, the policy was disregarded here because: (i) the borrower had limited liquidity; (ii) secondary payment of the loan was based upon liquidation of the collateral, and (iii) the property had yet to be re-zoned or annexed to support the development.

31.      To the extent the LAMs acknowledged some of these deficiencies, the LAMs attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the borrower's limited liquid assets and net worth allegedly were justified by the borrower's purported experience in owning similar properties and its supposed ability to stabilize properties that provide positive cash flow.

32.      By approving the Canzoneri Enterprises loans, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

33.      The borrower defaulted on the Canzoneri Enterprises loans.

34.      As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Canzoneri Enterprises loans, the FDIC incurred damages in excess of $3.6 million.

**AG Las Vegas**

35.     On November 8, 2005, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $1.950 million loan to AG Las Vegas, LLC for the acquisition of property located in Las Vegas, Nevada, where the sole tenant was a restaurant, bar, and video poker establishment. The loan was guaranteed by "Guarantor A."

36.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the AG Las Vegas loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

  a.     The guarantor's debt-to-income ratio was four times the Bank's 40% limit.

  b.     As financing for a tavern and restaurant, the loan constituted an "unacceptable loan" under the Bank's loan policy.

  c.     The debt service coverage ratio of 1.04 was below the Bank's minimum 1.15 debt service coverage for CRE loans.

  d.     This Las Vegas, Nevada loan was outside the Bank's target geographic market of the metropolitan Chicago area.

  e.     The loan exacerbated an unsafe and unsound concentration of credit with the guarantor, who had multiple pre-existing CRE loans outside of the Bank's target market.

37.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, an alleged justification for lending outside of the Bank's target geographic area was the supposed ability of the guarantor to support the loan payments from personal cash flow. The LAM, however, revealed that the guarantor did not provide a viable source of repayment because the guarantor's debt-to-income ratio far exceeded the Bank's limit.   Therefore, the alleged

justification for the exception to Bank policy was not correct as shown on the face of the LAM that Brinkman, Gremley, Pantazelos and Wholey signed.

38.     By approving the AG Las Vegas loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

39.     The borrower defaulted on the AG Las Vegas loan.

40.     As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the AG Las Vegas loan, the FDIC incurred damages in excess of $800,000.

**Gull Brothers South Beach**

41.     On April 11, 2006, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $720,000 loan to Gull Brothers South Beach, LLC for the acquisition of a 7,000 square foot parcel in Las Vegas, Nevada.  At the time, the property was improved with a 65-year-old, six-unit apartment building, but the borrower purchased the property for development purposes.  The loan was guaranteed by "Guarantor A" and "Guarantor B."

42.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the Gull Brothers South Beach loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.     The debt service coverage ratio of 0.34 was below the Bank's minimum 1.15 debt service coverage for CRE loans.

b.     Brinkman, Gremley, Pantazelos, and Wholey approved the loan for 80% of the appraised value of the property as vacant land, in excess of the 65% LTV maximum for raw land loans that should have been applied since no value was given to the property's existing improvements and the loan served to acquire the property.

    c.      One of the guarantors had debt-to-income ratios for several years exceeding the Bank's 40% maximum.

    d.      This loan exacerbated the Bank's overconcentration of CRE loans with the guarantors, who were already heavily invested in Las Vegas commercial real estate.

    e.      Although the borrower had no plans to develop the property within three to six months of its acquisition, Brinkman, Gremley, Pantazelos, and Wholey allowed interest-only payments for the entire loan term instead of immediately instituting a principal reduction program.

    f.      This Las Vegas, Nevada loan was outside the Bank's target geographic market of the metropolitan Chicago area.

43.      To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, one of the alleged justifications for lending on the property located outside of the Bank's target geographic market was that the guarantors both had homes in Las Vegas and the adult son of one of the guarantors permanently resided in Las Vegas. But the guarantors' residency in this distant market had no connection to the risks to which Brinkman, Gremley, Pantazelos and Wholey exposed the Bank in a market where they lacked knowledge and expertise.

44.      By approving the Gull Brothers South Beach loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

45.      The borrower defaulted on the Gull Brothers South Beach loan.

46.      As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Gull Brothers South Beach loan, the FDIC incurred damages in excess of $475,000.

**Pine Ridge Club**

47.     On June 6, 2006, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $15.4 million loan, split into two tranches, to Pine Ridge Club, LLC as refinancing and additional credit extension for a construction loan to build 256 one- and two-bedroom condominiums in Oswego, Illinois.  The loan was guaranteed by "Guarantor D."   The Bank extended the full amount ($3.75 million) approved for the first tranche, and $3.75 million of the $11.6 million contemplated for the second tranche.

48.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the Pine Ridge Club loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.     Brinkman, Gremley, Pantazelos, and Wholey failed to require pre-sales prior to the first phase of construction in which the clubhouse and first 64 condominiums were built.

b.     The development was highly speculative.  It was in a risky location – 50 miles from downtown Chicago and dependent on the development of unconfirmed transit projects.

c.     The 2006 LAM relied on outdated 2003 and 2004 tax returns for cash flow analysis of the borrower's principal and guarantor.

d.     The borrower's principal and guarantor had insufficient liquid assets of approximately 2% of the loan amount, and he was not required to pledge additional available collateral.

e.     The LAM failed to explain why the borrower sought to refinance with NCB, rather than with its current lender.

49.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices.  For example, the market risk in the real estate industry at the time allegedly was justified by the

number of units that had been reserved. The pre-sale requirement in the Bank loan policy, however, required more than reservations; as the LAM explained, it required a minimum of 5% earnest money and a signed contract. Mere reservations did not provide the Bank with sufficient assurance that the primary repayment source for the loan, the sales of the condominiums, would actually occur.

50.    By approving the Pine Ridge Club loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

51.    On June 16, 2008, at the recommendation of loan officer Romano, Pantazelos approved a $600,000 revolving line of credit to the Estate of Guarantor D, the deceased developer of the Pine Ridge Club project. Part of the credit line ($400,000) would be used for an interest reserve for the Pine Ridge Club loan guaranteed by Guarantor D. Additional funds would provide working capital to complete re-zoning of the mid-rise portion of the Pine Ridge Club project. The primary source of repayment of the line of credit was the sale of 100 acres of vacant land located immediately north of the Pine Ridge Club project, in which the estate had a 50% interest. The loan was secured by an assignment of the estate's 50% interest in the 100 acre parcel, as well as a mortgage on a Florida townhouse and condominium.

52.    Pantazelos received and signed a LAM (that Romano drafted with a Bank analyst), which revealed that the line of credit to the Estate of Guarantor D violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.    By extending funds to provide an interest reserve for the outstanding Pine Ridge Club loan, the Bank effectively was loaning money to pay itself back for the prior loan.

b.    By extending funds to provide working capital for the Pine Ridge Club loan, the

14

Bank increased its exposure with respect to the incomplete Pine Ridge Club project. At the time, the balance of the Pine Ridge Club loan was more than $11 million and would mature in less than a year, in March 2009.

c.    The primary source of repayment was highly speculative, as it depended on and assumed that the 100 acre transaction closed as expected within the one-year term of the line of credit. However, the anticipated April 1, 2008 closing date of the transaction had already passed at the time of the approval.

d.    The secondary source of repayment also was uncertain because it likewise depended on and assumed that other, unspecified estate assets would be sold to repay the loan.

e.    Pantazelos did not require any financial analysis or appraisal of the collateral prior to the approval. Moreover, the Florida collateral was located outside of the Bank's target market, in an area where the Bank did not have a presence and the directors and officers did not have knowledge of the market.

f.    The estate, which was in liquidation mode in an effort to retire all real estate related debt, lacked liquidity and cash flow.

53.    To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the risk that the 100 acre transaction would not close within the one-year term of the line of credit allegedly was justified because the estate was marketing other, unspecified real estate for sale. However, like the 100 acre parcel, there could be no guarantee that the other real estate would be sold within the term of the line of credit in order to repay the indebtedness.

54.    By approving the line of credit to the Estate of Guarantor D, despite the foregoing deficiencies, Pantazelos violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

55.    The borrower defaulted on the Pine Ridge Club loan and the related line of credit to the Estate of Guarantor D.

56.     As a result of Brinkman, Gremley, Pantazelos, Wholey, and Romano's negligence, gross negligence, and breaches of fiduciary duty with respect to the Pine Ridge Club loan and related line of credit, the FDIC incurred damages in excess of $5.4 million.

**Harp Des Plaines**

57.     On October 24, 2006, the DLC (Brinkman, Gremley, Pantazelos, and Wholey), at the recommendation of Romano, as loan officer, approved a $7.25 million loan to Harp Des Plaines, LLC to refinance the newly-formed company's first and second mortgages for a land purchase.  The borrower intended to build two hotels on the Des Plaines, Illinois property.  The loan was guaranteed by "Guarantor E," "Guarantor F," and "Guarantor G."

58.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM (that Romano drafted with a Bank analyst), which revealed that the Harp Des Plaines loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

   a.     The borrower had minimal cash equity ($382,000) in the project, which was to be repaid through the refinance, leaving the borrower with no cash equity in the project.

   b.     The repayment of the loan was dependent on the borrower obtaining a construction loan, which was speculative and not an independent source of repayment.

   c.     The LAM failed to explain why the existing lender was not refinancing the project and the reason for the cash-out of the borrower's already limited cash equity.

   d.     The loan policy's LTV limit of 75%, based on the "as-is" value of the land, was only reached by improperly including the speculative values of a billboard and hotel tax rebate, which were dependent on a hotel being built on the property.

59.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan

policy requirements and were not consistent with safe and sound banking practices. For example, the fact that repayment of the loan depended on the borrower first obtaining a construction loan allegedly was justified by the borrower's supposedly extensive experience in real estate development. But the borrower's real estate experience is only one of many factors that would affect whether it could obtain a construction loan, and, given all of the other weaknesses in the borrower's repayment position (*e.g.,* lack of equity, speculative LTV), the borrower's ability to obtain the construction loan that was identified as the primary repayment source for the loan was highly speculative.

60.     By approving the Harp Des Plaines loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

61.     The borrower defaulted on the Harp Des Plaines loan.

62.     As a result of Romano, Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Harp Des Plaines loan, the FDIC incurred damages in excess of $3.7 million.

**Normantown Prairie**

63.     On March 19, 2007, Brinkman approved a $500,000 unsecured, revolving line of credit to Normantown Prairie, LLC for the purpose of funding an equity shortfall in the borrower's plan to acquire land and complete a large-scale residential development in Plainfield, Illinois. The loan was guaranteed by "Guarantor H."

64.     Brinkman received and signed a LAM, which revealed that the Normantown Prairie loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a. The primary repayment source for the unsecured loan was the completion of equity syndication for the project. But this was a speculative and ill-defined repayment source because it assumed that, despite the tightening real estate markets, the borrower would be able to raise equity from other sources later in the year to repay back the Bank.

b. The secondary repayment source was an uncollectible guarantee. Most of the assets identified for the guarantor were not in his name.

c. The guarantor's debt-to-income ratios from 2003 to 2005 were twice the Bank's 40% maximum.

65. To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the fact that the loan was unsecured allegedly was justified because the guarantor supposedly was an experienced real estate developer. But this factor has little, if anything, to do with whether the loan could be repaid. The relevant inquiry should have been whether the guarantor had the financial resources to repay the loan, which he did not.

66. By approving the Normantown Prairie loan, despite the foregoing deficiencies, Brinkman violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

67. The borrower defaulted on the Normantown Prairie loan.

68. As a result of Brinkman's negligence, gross negligence, and breaches of fiduciary duty with respect to the Normantown Prairie loan, the FDIC incurred damages in excess of $500,000.

**GCC Merrillville Venture**

69. On May 22, 2007, the DLC (Brinkman, Gremley, Pantazelos, and Wholey), at the recommendation of Romano, as loan officer, approved a $10.2 million revolving line of credit (of which the Bank retained $5.2 million) to GCC Merrillville Venture, LLC, a new Bank

customer, to refinance a loan with a principal balance of $3.925 million used to purchase 102 acres of land in northwest Indiana. The balance of the loan was to be used for improvements on the property. The loan was guaranteed by "Guarantor I," "Guarantor J," "Guarantor K," "Guarantor L," and "Guarantor M."

70. Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM (that Romano drafted with a Bank analyst), which revealed that the GCC Merrillville Venture loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a. The loan did not have adequate sources of repayment. Instead, repayment was dependent on the speculative sale of individual property lots, and the guarantors lacked the cash flow to repay the loan if those sales did not materialize.

b. The LAM failed to explain why the existing lender did not refinance this loan.

c. The borrower had less than 3% cash equity into the project.

d. Despite Bank policy, Brinkman, Gremley, Pantazelos, and Wholey failed to require verification of the guarantors' liquid assets and tax returns.

71. To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, one of the alleged justifications for the borrower's lack of equity in the deal was that personal guaranties were provided. The LAM, however, revealed that the guarantors lacked the cash flow to repay the loan and did not supply written verification of their liquid assets.

72. Thereafter, on May 23, 2007, Romano sent a memo to the members of the DLC explaining that he did not believe additional information on the guarantors' ownership interests was necessary and that he thought the guarantors would view additional requests for information as too burdensome. Following receipt of that memo, Pantazelos, Gremley, and Wholey accepted

Romano's recommendation and permitted the loan to go forward without any written verification of the guarantors' assets.

73.     By approving the GCC Merrillville Venture loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

74.     The borrower defaulted on the GCC Merrillville Venture loan.

75.     As a result of Romano, Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the GCC Merrillville Venture loan, the FDIC incurred damages in excess of $3.1 million.

**Madison Racine**

76.     On May 24, 2007, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $6.5 million non-revolving line of credit to Madison Racine, LLC for the acquisition and pre-development costs associated with three contiguous parcels, which secured the loan, located in Chicago, Illinois.  The borrower planned to build an 8-story, 155-unit mixed-use building, with ground floor commercial space, at the northwest corner of Madison and Racine Streets.  The loan was guaranteed by "Guarantor N," "Guarantor O," and "Guarantor P."

77.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the Madison Racine loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

    a.     The primary repayment source – a to-be-obtained construction loan – was speculative since, as the LAM acknowledged, the Chicago condominium market had exhibited weakness over the 12 months prior to the loan's approval and could continue to be weak over the next 12 months.

    b.     The secondary source of repayment – cash flow from the operations of a company in which the guarantors were officers – likewise was speculative because, based on documents provided with the LAM, the company had poor financial

performances in 2003 and 2004 and only modestly improved its performance in 2005 and 2006.

c.     The tertiary repayment source – enforcement of the guarantees – also was uncertain because, based upon information the guarantors previously had provided the Bank, the guarantors' net worth had declined significantly in the months immediately prior to the loan's approval.

d.     The Bank's loan policy disfavored financing of vacant land and required careful analysis of whether the borrower and guarantors could service the loan.

e.     The collateral value was questionable and should have raised red flags, as the appraised value of $860,000 for the second parcel was significantly less than the purchase price of $1,200,000.

78.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the financial strength of the guarantors allegedly justified the poor financial performance of the guarantors' company, which was the secondary repayment source. The LAM, however, revealed that the guarantors' net worth was unstable and could not be relied upon since it recently had declined significantly.

79.     By approving the Madison Racine loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

80.     The borrower defaulted on the Madison Racine loan.

81.     As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Madison Racine loan, the FDIC incurred damages in excess of $1.3 million.

**Tam Drive**

82.     On June 12, 2007, the DLC (Brinkman, Gremley, Pantazelos, and Wholey) approved a $1.356 million loan to Tam Drive LLC for the acquisition of an apartment complex located in Las Vegas, Nevada.  The complex consisted of three buildings with a total of 24 units that, at the time of the acquisition, were being rented to clients of a ministry group that provided temporary housing to people recovering from substance abuse.  The guarantor, "Guarantor A," planned to evict the tenants and update the apartments to rent at higher rates.

83.     Brinkman, Gremley, Pantazelos, and Wholey received and signed a LAM, which revealed that the Tam Drive loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.     The loan's debt service coverage ratio of 0.73 was materially lower than the 1.15 minimum required for apartments under the Bank's loan policy.

b.     Brinkman, Gremley, Pantazelos, and Wholey approved the loan for 80% of the appraised value of the property as vacant land, in excess of the 65% LTV maximum for raw land loans, which was applicable to this loan because the appraiser gave no value to the property's existing improvements and the purpose of the loan was to acquire the property, not finance the development of it.

c.     This Las Vegas, Nevada loan was outside the Bank's target geographic market of the metropolitan Chicago area.

d.     The guarantor did not provide a viable source of repayment of the loan.  Only a fraction of the guarantor's assets ($380,000) were liquid, with the vast majority invested in real estate.  In addition, the loan further increased the guarantor's credit exposure at the Bank.  At the time, the guarantor also had guaranteed another Bank CRE loan to AG Marketplace, which had not yet been repaid and had been extended several times.

84.     To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices.  For example, the low debt service coverage ratio allegedly was justified because the guarantor

supposedly had acquired similar investment real estate in the past from which he had achieved positive cash flow in a short timeframe. But that past performance for different properties provided no assurance that the same result could be achieved here.

85.     By approving the Tam Drive loan, despite the foregoing deficiencies, Brinkman, Gremley, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

86.     The borrower defaulted on the Tam Drive loan.

87.     As a result of Brinkman, Gremley, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Tam Drive loan, the FDIC incurred damages in excess of $1.2 million.

**Regency of Park Ridge**

88.     On October 16, 2007, the DLC (Brinkman, Gremley, Metzger, Pantazelos, and Wholey) approved a $4.8 million non-revolving line of credit to Regency of Park Ridge, LLC, a new Bank customer, to refinance an existing land loan from another bank and to give the borrower time to achieve 30% pre-sales for obtaining a construction loan. The development plan for the Park Ridge, Illinois property was to construct a 58-unit five-story condominium building. The loan was guaranteed by "Guarantor Q."

89.     Brinkman, Gremley, Metzger, Pantazelos, and Wholey received and signed a LAM, which revealed that the Regency of Park Ridge loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.      Even though land loans are among the riskiest types of loans, the D&O Defendants approved the loan without clear and sufficient repayment sources.

b.      The principal repayment source was a speculative construction loan that the borrower would have to obtain from the Bank because it had not succeeded in obtaining one elsewhere.

c. An additional repayment source, the income and assets of the guarantor, were unverified. The information that the D&O Defendants did have – a mere letter from the guarantor's accountant stating that the guarantor had no tax liability from 2002 to 2006 – should have warned them that the guarantor had insufficient cash flow to support the loan, and, thus, the guarantor did not serve as an adequate secondary source of repayment.

d. The LAM failed to explain why the existing lender was not providing refinancing to the borrower.

90. To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the fact that the borrower was not able to obtain a construction loan for the proposed condominium project allegedly was justified because the project was located in a supposedly mature suburb in metropolitan Chicago. Yet the project had been in this same location during the whole time when the borrower previously failed to obtain a construction loan. No new information was provided that would explain why the borrower would be successful in obtaining that construction loan this time.

91. By approving the Regency of Park Ridge loan, despite the foregoing deficiencies, Brinkman, Gremley, Metzger, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

92. The borrower defaulted on the Regency of Park Ridge loan.

93. As a result of Brinkman, Gremley, Metzger, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Regency of Park Ridge loan, the FDIC incurred damages in excess of $1.9 million.

24

**Lincolnwood Town Plaza I**

94.     On March 11, 2008, the DLC (Brinkman, Gremley, Metzger, Pantazelos, and

Wholey) approved an $8.326 million loan to Lincolnwood Town Plaza I, LLC in connection

with the acquisition of a Lincolnwood, Illinois industrial building for development into a

combination of retail and industrial space.  The loan was guaranteed by "Guarantor R."  On June

17, 2008, after the borrower failed to raise the required outside equity for the project, Pantazelos

approved a second $500,000 loan to the borrower to help close the transaction.

95.     Brinkman, Gremley, Metzger, Pantazelos, and Wholey received and signed

LAMs, which revealed that the Lincolnwood Town Plaza I loans violated NCB's loan policy and

safe and sound banking practices in several respects, including, but not limited to, the following:

a.      Both the primary source of repayment (net operating income from the to-be-developed property) and the secondary source of repayment (principal repayment from a construction loan that the borrower first would have to obtain from the Bank) were speculative and particularly risky as the CRE market continued to weaken.  By approving the loans, Brinkman, Gremley, Metzger, Pantazelos, and Wholey disregarded the Bank's loan policy directing that they "must exercise astute, and careful due diligence . . . to minimize the prospects of an unanticipated adverse economic or market condition occurring which could significantly and negatively impact the Bank's position."

b.      The guarantor was not financially strong and was clearly insufficient as an alternative source of repayment.  The guarantor's liquid assets were approximately 2% of the loan, his annual debt service exceeded his liquid assets, and his outside net worth was less than 15% of the loan.

c.      The borrower's failure to raise the required equity following the first loan should have prevented Pantazelos from approving additional funds to the borrower.

d.      Pantazelos ignored regulatory warnings by loaning additional funds when the borrower failed to raise the required equity.  In the FDIC Report of Examination ("RoE") dated December 3, 2007, which was delivered to the Bank in January 2008, the FDIC regulators had warned the Bank's Board and management to avoid strategies that erode project equity and collateral and act as a disincentive for further borrower investment, especially when declining property values marginalize or eliminate the borrower's equity in the project.

25

96.     To the extent the LAMs acknowledged some of these deficiencies, the LAMs attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the guarantor's lack of financial strength allegedly was justified by his purported 20 years of experience in the CRE market while living in California. Once again, the guarantor's past experience does not create funds with which to repay the loans.

97.     By approving the Lincolnwood Town Plaza I loan, despite the foregoing deficiencies, Brinkman, Gremley, Metzger, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

98.     The borrower defaulted on the Lincolnwood Town Plaza I loans less than one year after they were approved.

99.     As a result of Brinkman, Gremley, Metzger, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the Lincolnwood Town Plaza I loans, the FDIC incurred damages in excess of $6.4 million.

**Eagle American/18 Leasing**

100.     On April 29, 2008, Metzger approved, at the recommendation of Romano, as loan officer, a $1.85 million loan to Eagle American Logistics, LLC and 18 Leasing, LLC (collectively, "Eagle American/18 Leasing") for a multi-stage restructuring of a trucking business that was losing money and was delinquent on $2.1 million in debt owed to another financial institution. The loan was guaranteed by "Guarantor S" and "Guarantor T."

101.     Romano failed to require, as a condition precedent to funding of the Eagle American/18 Leasing loan, that the Bank obtain the titles to the collateral or place them in escrow. Instead, in direct contravention of the Bank's loan policy, Romano only requested that

the prior lender provide written confirmation detailing the specific collateral securing the debt. As a result, the Bank did not obtain any rights to the collateral prior to funding and ultimately had significantly inadequate security for the loan. Metzger did not raise any questions about why securing the collateral was not identified as a condition precedent to funding. Romano also did not require as a condition precedent to funding the Eagle American/18 Leasing loan that the Bank receive and review UCC, tax, and lien searches on the purported collateral. Metzger again did not raise questions about the absence of a condition precedent to funding that required receipt and review of this critical collateral documentation.

102. Metzger received and signed a LAM (that Romano drafted with a Bank analyst), which revealed that the Eagle American/18 Leasing loan violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a. The primary source of repayment for the loan was supposed to come from the Bank through a refinancing, which was not an independent source of repayment.

b. The secondary source – cash flow from operations – also was problematic because 18 Leasing was created in order to restructure a business that had lost money in each quarter of the prior year and faced significant business difficulties.

c. The tertiary source of repayment – the collateral – was not secured.

d. The guarantors lacked sufficient assets to provide an adequate source of repayment for the loan. "Guarantor S" only had a net worth of $475,000, with just $20,000 in cash, and only had income for one of the three years prior to the loan. "Guarantor S" also had a 2006 judgment filed against him by the State of Maryland relating to a tax lien. "Guarantor T" had less than $1 million in liquid assets, had no reported income in 2005 or 2006, and a low credit score due to several late payments.

103. To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For

example, the fact that 18 Leasing suffered losses in the prior year allegedly was justified because the company supposedly was well-managed.

104.　By approving the Eagle American/18 Leasing loan, despite the foregoing deficiencies, Metzger violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

105.　The borrowers defaulted on the Eagle American/18 Leasing loan.

106.　As a result of Metzger and Romano's negligence, gross negligence, and breaches of fiduciary duty with respect to the Eagle American/18 Leasing loan, the FDIC incurred damages in excess of $1.4 million.

**600 Waukegan**

107.　On July 1, 2008, the DLC (Gremley, Metzger, Pantazelos, and Wholey) approved a modification of a first mortgage ("Loan A") and the issuance of a second mortgage ("Loan B") to 600 Waukegan Road, LLC to complete the construction of industrial storage units and a multi-use soccer facility in Northbrook, Illinois.　Loan A was a $1.4 million retained share in a $6.6 million facility, and Loan B was a non-revolving line of credit up to $1.796 million but not to exceed 85% of the "as completed" value of the property.　The loans were guaranteed by "Guarantor U," "Guarantor V" and "Guarantor W."

108.　Gremley, Metzger, Pantazelos, and Wholey received and signed a LAM, which revealed that the 600 Waukegan Road Loan B violated NCB's loan policy and safe and sound banking practices in several respects, including, but not limited to, the following:

a.　Repayment was based upon the sale of components of the project and/or refinance of the property, both of which were highly speculative, given the declines in the real estate market and the availability of refinancing for such a project.

b.   The relevant LTV ratio of 75% for multi-tenant industrial properties and land development was exceeded for the loan because Loan B was improperly approved for up to 85% of the "as completed" appraised value of the property.

c.   Two of the guarantors' debt-to-income ratios for 2006 – the most recent year for which Gremley, Metzger, Pantazelos, and Wholey had information – were 248% and 147%, which exceeded the Bank's 40% maximum.

d.   The loan presented unsafe and unsound concentrations of credit in the guarantors and failed to ensure adequate debtor repayment programs. "Guarantor U" had exposure to the Bank of nearly $8 million, liquid assets of only $300,000, and deposits with NCB of only $36,000. "Guarantor W" had exposure to NCB of nearly $4.5 million and unverified liquid assets of only $50,000. The debt-to-income ratios of both "Guarantor U" and "Guarantor W" exceeded the Bank's maximum of 40%.

e.   Gremley, Metzger, Pantazelos, and Wholey failed to heed regulatory warnings by creating a $320,000 interest reserve in Loan B to pay for interest on Loan A and repaying $300,000 in equity contributed by "Guarantor U" at the earliest opportunity. The FDIC's RoE dated December 3, 2007, which was delivered to the Bank in January 2008, had warned the Bank's Board and management against the use of risk deferment strategies that may mask the true level of potential problems within the portfolio. That FDIC RoE also had warned against the use of risk deferment strategies that erode project equity and collateral and act as a disincentive for further borrower investment.

109.   To the extent the LAM acknowledged some of these deficiencies, the LAM attempted to justify them on the basis of factors that were not grounds to deviate from the loan policy requirements and were not consistent with safe and sound banking practices. For example, the illiquidity of the guarantors allegedly was justified by the sports concept for the project, which gave new life to the previously stagnant project, and because the stabilization of the project would generate operating income to service the debt and create value. But the LAM also recognized that the rental income from sports users might not be sufficient to service the debt, and no likely alternatives to repay the loan existed.

110.    By approving the 600 Waukegan Road Loan B, despite the foregoing deficiencies, Gremley, Metzger, Pantazelos, and Wholey violated the Bank's loan policy, as well as prudent, safe, and sound lending practices.

111.    The borrower defaulted on the 600 Waukegan Road Loan B.

112.    As a result of Gremley, Metzger, Pantazelos, and Wholey's negligence, gross negligence, and breaches of fiduciary duty with respect to the 600 Waukegan Road Loan B, the FDIC incurred damages in excess of $1.7 million.

## CLAIMS FOR RELIEF

## CLAIMS AGAINST D&O DEFENDANTS
**(Pantazelos, Brinkman, Metzger, Gremley, and Wholey)**

## COUNT I
### Negligence (Illinois law) – Approval of Target Loans

113.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

114.    As officers and/or directors of NCB, the D&O Defendants owed duties to the Bank to conduct its business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

a.      To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

b.      To review carefully the RoEs and other directives of regulatory agencies, to carry out the instructions and orders contained in any such directives, to investigate problems noted therein, and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

c.      To actively review and approve or disapprove each loan;

d.      To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations,

bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

e.    To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

f.    To ensure that NCB did not engage in any unsafe or unsound practices.

115.    The D&O Defendants breached their duties and were negligent by, *inter alia*, voting to approve four or more of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.    Failing to establish adequate debt repayment programs;

b.    Extending credit in excess of permitted LTV limits;

c.    Failing to adhere to required debt-to-income ratios;

d.    Extending credit outside the Bank's normal trade area;

e.    Permitting debt service coverage ratios below minimum requirements;

f.    Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

g.    Failing to obtain information about why existing lenders were not refinancing loans;

h.    Increasing risk through the creation of interest reserves;

i.    Failing to require principal reduction programs;

j.    Approving undesirable and highly speculative loans;

k.    Inadequately assessing project viability and risks; and

l.    Failing to heed warnings of bank supervisory authorities.

116.    As a direct and proximate result of the D&O Defendants' negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $33 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendants Faye T. Pantazelos, John R. Brinkman, George Metzger, Robert C. Gremley, and Richard J. Wholey in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## COUNT II
### *In the Alternative*
### Breach of Fiduciary Duty (Illinois law) – Approval of Target Loans

117.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

118.    The allegations in this Count are pleaded in the alternative to the allegations in Count I, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

119.    The D&O Defendants owed NCB fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction of the business of NCB.  These duties included, but were not limited to, the following:

a.    To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

b.    To review carefully the RoEs and other directives of regulatory agencies, to carry out the instructions and orders contained in any such directives, to investigate problems noted therein, and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

c.    To actively review and approve or disapprove each loan;

d.    To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

e.    To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

f.    To ensure that NCB did not engage in any unsafe or unsound practices.

120.    The D&O Defendants breached their fiduciary duties by, *inter alia*, voting to approve four or more of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.    Failing to establish adequate debt repayment programs;

b.    Extending credit in excess of permitted LTV limits;

c.    Failing to adhere to required debt-to-income ratios;

d.    Extending credit outside the Bank's normal trade area;

e.    Permitting debt service coverage ratios below minimum requirements;

f.    Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

g.    Failing to obtain information about why existing lenders were not refinancing loans;

h.    Increasing risk through the creation of interest reserves;

i.    Failing to require principal reduction programs;

j.    Approving undesirable and highly speculative loans;

k.    Inadequately assessing project viability and risks; and

l.    Failing to heed warnings of bank supervisory authorities.

121.    As a direct and proximate result of the D&O Defendants' breaches of fiduciary duty, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $33 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendants Faye T.

Pantazelos, John R. Brinkman, George Metzger, Robert C. Gremley, and Richard J. Wholey in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## COUNT III
### In the Alternative
### Gross Negligence (12 U.S.C. § 1821(k)) – Approval of Target Loans

122.    The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

123.    The allegations in this Count are pleaded in the alternative to the allegations in Count I, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

124.    During all relevant times alleged, the D&O Defendants were officers and/or directors of NCB.

125.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law. Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

126.    As officers and/or directors of NCB, the D&O Defendants owed duties to the Bank to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances. These duties included, but were not limited to, the following:

    a.      To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

    b.      To review carefully the RoEs and other directives of regulatory agencies, to carry out the instructions and orders contained in any such directives, to investigate

problems noted therein, and to establish and maintain procedures to ensure no recurrence of any deficiencies set forth therein;

c.    To actively review and approve or disapprove each loan;

d.    To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

e.    To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

f.    To ensure that NCB did not engage in any unsafe or unsound practices.

127.    The D&O Defendants breached their duties and were grossly negligent by, *inter alia*, voting to approve four or more of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.    Failing to establish adequate debt repayment programs;

b.    Extending credit in excess of permitted LTV limits;

c.    Failing to adhere to required debt-to-income ratios;

d.    Extending credit outside the Bank's normal trade area;

e.    Permitting debt service coverage ratios below minimum requirements;

f.    Relying on outdated, unverified, and inadequate financial information for borrowers and guarantors;

g.    Failing to obtain information about why existing lenders were not refinancing loans;

h.    Increasing risk through the creation of interest reserves;

i.    Failing to require principal reduction programs;

j.    Approving undesirable and highly speculative loans;

k.    Inadequately assessing project viability and risks; and

l.    Failing to heed warnings of bank supervisory authorities.

128.     As a direct and proximate result of the D&O Defendants' gross negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $33 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendants Faye T. Pantazelos, John R. Brinkman, George Metzger, Robert C. Gremley, and Richard J. Wholey in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

## CLAIMS AGAINST ROMANO

### COUNT IV
### Negligence (Illinois law) –
### Origination, Recommendation, and/or Administration of Target Loans

129.     The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

130.     As an officer of NCB, Romano owed duties to the Bank to conduct its business consistent with safe and sound lending practices.  These duties included, but were not limited to, the following:

  a.     To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

  b.     To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

  c.     To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

  d.     To ensure that NCB did not engage in any unsafe or unsound practices.

131.     Romano breached his duties and was negligent by, *inter alia*, originating, recommending, and/or administering several of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.     Recommending loans with inadequate repayment sources;

b.     Failing to obtain adequate financial documentation for borrowers and guarantors;

c.     Failing to obtain information as to why existing lenders were not refinancing;

d.     Failing to take steps to secure collateral; and

e.     Failing to obtain and review documentation concerning purported collateral prior to loan disbursement.

132.     As a direct and proximate result of Romano's negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $8 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendant Thomas J. Romano in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

### COUNT V
### *In the Alternative*
### Breach of Fiduciary Duty (Illinois law) –
### Origination, Recommendation, and/or Administration of Target Loans

133.     The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

134.     The allegations in this Count are pleaded in the alternative to the allegations in Count IV, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

135.    Romano owed NCB fiduciary duties to exercise the highest degree of loyalty, care, diligence, and fair dealing in the management, conduct, and direction of the business of NCB.  These duties included, but were not limited to, the following:

a.    To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

b.    To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations, bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

c.    To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

d.    To ensure that NCB did not engage in any unsafe or unsound practices.

136.    Romano breached his fiduciary duties by, *inter alia*, originating, recommending, and/or administering several of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.    Recommending loans with inadequate repayment sources;

b.    Failing to obtain adequate financial documentation for borrowers and guarantors;

c.    Failing to obtain information as to why existing lenders were not refinancing;

d.    Failing to take steps to secure collateral; and

e.    Failing to obtain and review documentation concerning purported collateral prior to loan disbursement.

137.    As a direct and proximate result of Romano's breaches of fiduciary duty, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $8 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendant Thomas J. Romano in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

**COUNT VI**
*In the Alternative*
**Gross Negligence – (12 U.S.C. § 1821(k)) –**
**Origination, Recommendation, and/or Administration of Target Loans**

138.     The FDIC realleges and incorporates by reference the allegations contained in paragraphs 1-112, above, as if fully set forth in this Count.

139.     The allegations in this Count are pleaded in the alternative to the allegations in Count IV, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

140.     During the relevant times, Romano was an officer of NCB.

141.     Section 1821(k) of FIRREA holds officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

142.     As an officer of NCB, Romano owed duties to the Bank to carry out his responsibilities by exercising the degree of care, skill, and diligence that an ordinarily prudent person in a like position would use under similar circumstances.  These duties included, but were not limited to, the following:

a.     To manage, conduct, and direct the business and affairs of NCB in accordance with and to ensure compliance with applicable laws, regulations, bylaws, Bank policies, and sound and prudent banking practices;

b.     To take such action as necessary to ensure that NCB's loans were underwritten, approved, disbursed, and collected in accordance with the law, regulations,

bylaws and Bank policies applicable thereto and in accordance with sound and prudent banking practices;

c.      To exercise independent judgment in the best interests of NCB in the conduct of its business and affairs; and

d.      To ensure that NCB did not engage in any unsafe or unsound practices.

143.    Romano breached his duties and was grossly negligent by, *inter alia*, originating, recommending, and/or administering several of the Target Loans described above, in violation of the Bank's loan policy and prudent, safe, and sound lending practices, and by:

a.      Recommending loans with inadequate repayment sources;

b.      Failing to obtain adequate financial documentation for borrowers and guarantors;

c.      Failing to obtain information as to why existing lenders were not refinancing;

d.      Failing to take steps to secure collateral; and

e.      Failing to obtain and review documentation concerning purported collateral prior to loan disbursement.

144.    As a direct and proximate result of Romano's gross negligence, the FDIC suffered damages in an amount to be determined at trial, now believed to be in excess of $8 million.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation as Receiver for New Century Bank demands trial by jury and judgment in its favor and against Defendant Thomas J. Romano in an amount to be determined at trial, for prejudgment interest, for its costs, and for such other and further relief as the Court deems just and proper.

DATED:        March 26, 2013

/s/  Randall D. Lehner

Randall D. Lehner (#6237535)
Julia R. Lissner (#6294431)
Booker T. Coleman, Jr. (#6305324)
Ulmer & Berne LLP
500 W. Madison, Suite 3600
Chicago, IL 60661
312.658.6500
312.658.6501 (fax)
rlehner@ulmer.com
jlissner@ulmer.com
bcoleman@ulmer.com

*Attorneys for Plaintiff*